UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
STEPHEN M. STERNKOPF,

                              Plaintiff,                         No. 14-CV-4076 (CS)

          -against-                                              **OPINION & ORDER**


WHITE PLAINS HOSPITAL,

                              Defendant.
------------------------------------------------------------------------x

<u>Appearances</u>:

Howard E. Shafran
Shafran & Mosley, P.C.
White Plains, New York
*Counsel for Plaintiff*

Francis Carling
New York, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

        Before this Court is Defendant's Motion to Dismiss.  (Doc. 9.)  For the reasons stated

below, Defendant's motion is GRANTED.

## I.  <u>Background</u>

        The facts (although not the conclusions) in the First Amended Complaint ("AC"), (Doc.

8), are assumed to be true for purposes of this motion.

        Plaintiff Stephen Sternkopf is a former employee of Defendant White Plains Hospital (the

"Hospital"), where he worked for approximately 25 years in facilities maintenance and as a

maintenance mechanic.  (AC ¶ 16.)  The Hospital is a not-for-profit organization that provides

medical care in Westchester County, New York.  (*Id.* ¶ 12.)  Plaintiff's duties at the Hospital

1

included repairing, replacing or otherwise improving hospital equipment, which involved

performing skilled work in various crafts including plumbing, electrical and painting. (*Id.* ¶ 17.)

Plaintiff's work during the course of his employment was evaluated as "exemplary" and

"satisfactor[]y." (*Id. ¶* 37.)

On October 20, 2012, Plaintiff was involved in an accident and shattered his knee,

requiring hospitalization and surgery. (*Id. ¶* 19.)[1]  During his hospitalization (the duration of

which Plaintiff fails to specify), Plaintiff fell and tore his rotator cuff, requiring additional

surgery. (*Id.* ¶ 19.)  Plaintiff also suffered from bipolar disorder for the last fifteen years of his

employment, (*id.* ¶ 38), but until October 2012 it had never impeded Plaintiff's ability to perform

his job.  Beginning around that same time, Plaintiff also suffered from a "substance abuse"

problem. (*Id.* ¶ 33.)  As a result of these physical and mental impairments, Plaintiff, sometime

after October 20, 2012, "requested leave under the FMLA and/or an accommodation, and/or

short term disability pursuant to the ADA . . . ." (*Id.* ¶ 19.)  The Hospital granted Plaintiff's

request for disability leave under its policy which allowed for 26 weeks of leave in a 52-week

period. (*Id.* ¶ 20.)

At some unspecified point thereafter, based on his physical injuries, Plaintiff asked to be

placed in Hospital housing that existed as "accommodation[s] for employees with disabilities."

(*Id.* ¶ 40.)  Around the same time, Plaintiff also attempted to move to a non-Hospital apartment

which, Plaintiff claims, for some unspecified reason required approval from the Hospital. (*Id.*)

In support of Plaintiff's requests for housing accommodations, he presented to the Hospital a

---

[1] Plaintiff also states he hurt his leg on October 28, 2012, as the result of a manic episode related to a change in his medication for bipolar disorder. (AC ¶ 39.)  Elsewhere he states that the manic episode resulted in his assaulting police. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("P's Opp."), (Doc. 19), at 8).  The differences are not material for purposes of the motion.

letter from a social worker.  (AC ¶ 40.)[2]  The Hospital did not grant Plaintiff's requests regarding housing.  (*Id.*)

Plaintiff further alleges that at some point "prior to . . . March 29th, 2013" he was "retaliated against" for an unspecified reason when his supervisor, Ozzie Dahl, "assigned [him] to the maintenance shop, which was a demotion from shop Stewart [*sic*]."  (*Id.* ¶ 46.)  Apparently in response to Plaintiff's complaint to his union regarding this move, Dahl called Plaintiff an "overpaid asshole."  (*Id.* ¶ 46.)   Further, on an unspecified date, Dahl made "preferential" and "special arrangements" for Plaintiff's coworker, George Heienmann, after Heienmann lost his driver's license after his second driving while intoxicated offense.  (*Id.* ¶¶ 44-45.)  The nature of those arrangements is not described.

Around March 21, 2013, the Hospital's Vice President of Human Resources, John Sanchez, informed Plaintiff that if Plaintiff exceeded the 26-week disability leave allotment, he would be unable to return to his position at the Hospital.  (*Id.* ¶ 22.)  On March 29, 2013 (by which point Plaintiff had used 25.4 weeks of leave), Plaintiff attempted to return to work by reporting to the Employee Health office and informing a Hospital employee, Kristina Sposato, that he was ready, willing and able to return to work that day.  (*Id.* ¶¶ 23-24, 26, 28.)  In compliance with Hospital requirements that employees returning from disability leave present a note that they are fit to work, (*see id.* ¶ 24; Affirmation of Francis Carling in Support of Defendant's Motion to Dismiss ("Carling Aff."), (Doc. 11), Ex. 1, at 8; Ex. 3, at 2), Plaintiff presented Sposato with a letter, dated March 28, 2013, from Dr. Shakeep Hussain (the "Hussain

---

[2] Plaintiff describes this letter as one from a social worker at the hospital where his orthopedic injuries were treated. (*Id.* ¶ 40.)  He does not describe its contents or say when he presented it to the Hospital.  If this letter is the same one to which he refers in ¶ 25 (which is unclear), it described "a planned course of continual aftercare," (*id.* ¶ 25), which sounds like it related to a non-physical injury.  In any event, Plaintiff nowhere alleges that it in any fashion stated that he was fit to return to work on or about April 1, 2013, which – as discussed below – is relevant to Plaintiff's claim for discriminatory termination.

Letter"). Plaintiff claims this letter "medically clear[ed] plaintiff to return to his employment."

(AC ¶ 24.) The Hussain Letter stated, in relevant part:

> [Plaintiff] has been treated at Phelps Hospital from March 12-28, 2013. During his treatment on Phelps BRU, [Plaintiff] has shown no major behavioral issues and has been active and participatory in work in the program, with developing some insight. It is my opinion that were he to continue to maintain sobriety as well as to continue follow-up with outpatient treatment, he is likely to maintain improvement. If you have any questions, you may contact me . . . .

(Carling Aff. Ex. 6.) It was addressed "To Whom It May Concern" and said nothing about Plaintiff's fitness for employment. Sposato told Plaintiff, "I feel you are not ready to come back to work and that your job is terminated," and "you are now going through a divorce you will not be ready to start work before the deadline of April 1, 2013." (AC ¶ 26.) April 1, 2013 was the day by which Plaintiff had to return to work before he exceeded the maximum allowable 26 weeks of leave, after which, under Hospital policies, the Hospital would not guarantee an employee's job. (Carling Aff. Ex. 3, at 1.)

Plaintiff, unhappy with Sposato's decision, took the Hussain Letter to Sanchez, and with Sposato present informed Sanchez that he was ready to return to work that day. (AC ¶ 27.) Sanchez, apparently referring to the Hussain Letter, remarked that "[t]he letter does not matter," and that if Plaintiff returned to work, security would escort him out of the building. (*Id.*) Plaintiff claims Sanchez further opined that Plaintiff needed "more time to deal with [his] mental illness and divorce, and that more time would cause [him] to go over the time allowed to hold [his] position." (*Id.*) Plaintiff responded that he was currently undergoing treatment for his "mental illness," and that he was "actively in a 12 step program." (*Id.*) Plaintiff also requested an "accommodation to treat his mental impairment." (*Id.*) Sanchez responded by telling Plaintiff "to leave and not to return on April 1, 2013." (*Id.*) Plaintiff claims that as of March 29, 2013, the Hospital was in possession of documents showing Plaintiff was medically cleared to

4

return to full duty on that date, (*id.* ¶ 29), although the AC is silent as to what they might have been, other than the Hussain Letter.  Despite what Plaintiff believed amounted to "medical proof" of his ability to perform the essential elements of his job with reasonable accommodations, the Hospital "determined unilaterally that plaintiff wasn't ready to return to work," and terminated Plaintiff's employment.  (*Id.* ¶¶ 30-32.)

After his termination, Plaintiff, pursuant to his union's collective bargaining agreement, filed a grievance regarding whether his termination was for cause.  (*See* Carling Aff. Ex. 5.)  An arbitrator for the Federal Mediation and Conciliation Service rendered a written Opinion and Award finding in favor of the Hospital.  (*Id.*)  Subsequently, on September 30, 2013, Plaintiff dual-filed an administrative complaint with the New York State Division of Human Rights ("SDHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on "disability" and "marital status."  (*Id.* Ex. 2.)  The SDHR conducted an investigation and issued a Determination and Order After Investigation, dismissing Plaintiff's complaint and concluding that there was no probable cause to believe the Hospital engaged in the discriminatory practices complained of by Plaintiff.  (*See* Carling Aff. Ex. 3.)  The EEOC adopted those findings, and issued a right-to-sue letter on April 17, 2014.  (*Id.* Ex. 4.)

Plaintiff filed this action on June 5, 2014, (*see* Doc. 1), and after a pre-motion conference on Defendant's contemplated motion to dismiss, filed the AC on August 27, 2014, (Doc. 8). Plaintiff claims the Hospital violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act, 29 U.S.C. §§ 701-794, when it failed to provide reasonable accommodations, discriminated against him based on his disability, and retaliated against him because of his protected activity, ultimately resulting in his termination.  Plaintiff demands compensatory and punitive damages, as well as injunctive relief.  Defendant moves to

dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted.

## II. <u>Legal Standard</u>

### A.  Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to

relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

### B.  Documents Considered on a Motion to Dismiss

When deciding a motion to dismiss for failure to state a claim, the Court is entitled to

consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it
> by reference, (2) documents "integral" to the complaint and relied upon in it, even
> if not attached or incorporated by reference, (3) documents or information
> contained in [a] defendant's motion papers if plaintiff has knowledge or possession
> of the material and relied on it in framing the complaint, (4) public disclosure
> documents required by law to be, and that have been, filed with the Securities and
> Exchange Commission, and (5) facts of which judicial notice may properly be taken
> under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation

marks omitted).  A document is considered "integral" to the complaint where the plaintiff has

"reli[ed] on the terms and effect of [the] document in drafting the complaint."  *Chambers v. Time*

*Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002) (emphasis omitted).  If a document outside of the

complaint is to form the basis for dismissal, however, two requirements must be met in addition

to the requirement that the document be "integral" to the complaint:  (1) "it must be clear on the

record that no dispute exists regarding the authenticity or accuracy of the document;" and (2)

"[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance

of the document."  *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Defendant submits:  (1) Plaintiff's Verified Complaint to the SDHR, (Carling Aff. Ex 1),

which was dual-filed with the EEOC, (*id.* Ex. 2); (2) a notice of charge from the EEOC, (*id.*); (3)

the SDHR's Determination and Order After Investigation dismissing Plaintiff's complaint, (*id.*

Ex. 3); (4) the EEOC's Dismissal and Notice of Rights letter, (*id.* Ex. 4); (5) an Opinion and

Award from the Federal Mediation and Conciliation Service resulting from the union grievance

filed by Plaintiff regarding his termination, (*id.* Ex. 5); and (6) the Hussain Letter, (*id.* Ex. 6). I may take judicial notice of the first four documents because they are public records, *see Daniel v. Long Island Housing P'ship, Inc.*, No. 08-CV-1455, 2009 WL 702209, at *5 n.4 (E.D.N.Y. Mar. 13, 2009) ("The Court may consider the EEOC charges because they are public documents filed in state administrative proceedings, as well as because they are integral to [plaintiff's] [statutory discrimination claim]."); *Lindner v. Int'l Bus. Machs. Corp.*, No. 06-CV-4751, 2008 WL 2461934, at *1 n.1 (S.D.N.Y. June 18, 2008) (taking judicial notice of plaintiff's filings with EEOC and SDHR); *Muhammad v. N.Y.C. Transit Auth.*, 450 F. Supp. 2d 198, 204-05 (E.D.N.Y. 2006) ("EEOC charge and the agency's determination are both public records, of which this Court may take judicial notice"), and may otherwise consider them because they are incorporated by reference into and integral to the AC, *Muhammad*, 450 F. Supp. 2d at 204 ("Courts in this Circuit have repeatedly held that when [as here, (*see* AC ¶ 4),] EEOC charges are expressly referred to in the pleading, they may be considered incorporated by reference.").

Further, I may take judicial notice of the arbitral award because it is an opinion issued in a prior proceeding, *see Gorbaty v. Kelly*, No. 01-CV-8112, 2003 WL 21673627, at *2 n.3 (S.D.N.Y. July 17, 2003), but "'only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion.'" *See Henneberger v. Cnty. of Nassau*, 465 F. Supp. 2d 176, 185 (2006) (quoting *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) (citing cases).[3]

---

[3] Defendant, while acknowledging that I am not required to do so, argues that I should grant preclusive effect to the arbitrator's factual findings. (Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint ("D's Mem."), (Doc. 10), 8-9.) To support this argument, Defendant cites *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113 (2d Cir. 2002), and *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), both of which are unavailing. First, both cases involved consideration of an arbitrator's award at the summary judgment stage. Second, in declining to give preclusive effect to an arbitral award in a discrimination case, *Alexander* reasoned that, "[p]arties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations. On the other hand, the resolution of statutory or constitutional issues is a primary responsibility of courts." *Alexander*, 415 U.S. at 57. Indeed, as *Alexander* concluded in the analogous Title VII context, "the federal policy

Finally, with respect to the Hussain Letter, although Plaintiff does not attach it to the AC, it is integral because the AC both specifically refers to the letter several times, (*see, e.g.*, AC ¶¶ 24, 26-27), and relies heavily upon its terms for the proposition that Plaintiff's employment was terminated despite him being "medically evaluated as being able to return to full duty," (AC ¶ 29).

As the aforementioned documents are either incorporated into the AC by reference, integral to the AC, and/or the proper subject of judicial notice, and because Plaintiff does not dispute the authenticity of any of the documents, I will therefore consider them.[4]

## III. Discussion

### A. Qualifying Disabilities under the Americans with Disabilities Act and Rehabilitation Act

All of Plaintiff's claims are brought pursuant to the ADA and the Rehabilitation Act, which prohibit employers from discriminating "against a qualified individual on the basis of

---

favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under [a] grievance-arbitration clause of a collective bargaining agreement and his [statutory] cause of action." *Id.* at 59-60. And, although Defendant quotes a footnote in *Alexander* stating that a court may give an arbitral decision "great weight . . . where the issue is solely one of fact," *id.* at 60 n.21, Defendant omits the beginning of the sentence, which clarifies that, *"[w]here an arbitral determination gives full consideration to an employee's Title VII [i.e., discrimination] rights*, a court may properly accord it great weight." *Id.* (emphasis supplied). Here, Defendant acknowledges that Plaintiff did not submit his discrimination claims to the arbitrator.

Further, the *Alexander* court was concerned that "the factfinding process in arbitration usually is not equivalent to judicial factfinding." *Id.* at 57. As a result, parties to arbitration may not be considering the consequences of judicial issue preclusion when arguing their cases before an arbitrator. In the end, *Alexander* adopted "no standards as to the weight to be accorded an arbitral decision," and instead left the decision to "the court's discretion with regard to the facts and circumstances of each case." *Id.* at 60 n.21. Accordingly, I find it appropriate to decline Defendant's invitation to "give preclusive effect to the arbitrator's findings of fact," (D's Br., at 9), and will instead accept as true the facts as pleaded in the AC. *See Giles v. City of N.Y.*, 41 F. Supp. 2d 308, 313 (S.D.N.Y. 1999) ("[A] post-arbitration proceeding is not bound by the arbitrator's factual conclusions.") (internal quotation marks omitted).

[4] Plaintiff, in his opposition to the present motion, initially attempted to submit a plethora of documents inappropriate for consideration on a Rule 12(b)(6) motion to dismiss. For the reasons stated in the Court's January 28, 2015 order, (Doc. 18), those opposition papers, including an affirmation and attached exhibits, (Docs. 13-14), were stricken. Plaintiff properly resubmitted his opposition on January 30, 2015, (Doc. 19).

disability."  42 U.S.C. § 12112(a); *see* 29 U.S.C. § 794(a) (setting forth the same type of

prohibition).[5]  Plaintiff's muddled AC is confusing at best and at worst internally contradictory,

but it seems to allege that the Hospital violated the ADA by:  (1) failing to provide him

reasonable accommodations that would allow him to perform the essential functions of his job;

(2) disparately treating him based on his disability, including by firing him; and (3) retaliating

against him for ADA-protected activity, including by firing him.

An essential element of the first two claims is that Plaintiff be an individual with a

"disability" within the meaning of the ADA.  *See, e.g.*, *St. Jules v. United Parcel Serv., Inc.*, No.

09-CV-1201, 2010 WL 1268071, at *1 (E.D.N.Y. Mar. 31, 2010).  Defendant argues that

Plaintiff fails to allege that he has a qualifying disability under the ADA.  (D's Br., at 19-22.)

A "disability" under the ADA is defined as:  (A) a physical or mental impairment that

substantially limits one or more of the major life activities of such individual; (B) a record of

such an impairment; or (C) being regarded as having such an impairment.  42 U.S.C. § 12102(1);

29 U.S.C. § 705(20)(B).  Significantly, "[m]erely having an impairment does not make one

disabled for purposes of the ADA.  Claimants also need to demonstrate that the impairment

limits a major life activity."  *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002).

Accordingly, a successful ADA plaintiff must:  (1) show that he suffers from a physical or

mental impairment; (2) identify an activity claimed to be impaired and establish that it

constitutes a major life activity; and (3) show that his impairment substantially limits the major

---

[5] Although Plaintiff brings claims under both the ADA and Rehabilitation Act, (AC ¶ 1), Plaintiff, in his AC, refers
to both, interchangeably, as the "ADA," (*id.* ¶ 2).  Plaintiff does not allege that any of his claims or arguments under
the ADA differ from those under the Rehabilitation Act (which protects individuals from the same discrimination as
the ADA, but applies to federally funded or operated programs or employers), nor does he set forth a reason why the
Rehabilitation Act is applicable to the present suit.  In any event, because both statutes are "very similar" in offering
protection from discrimination for practically identical disabilities, *see Francis v. City of Meriden*, 129 F.3d 281,
283 (2d Cir. 1997), it is appropriate to apply the same analysis to Plaintiff's claims – to whatever extent he means to
raise them under the ADA, the Rehabilitation Act, or both, *see id.* at 283-85 (analyzing ADA and Rehabilitation
claims together).  Accordingly, I refer herein to both Acts, together, as the "ADA."

life activity. *Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998). In evaluating whether an impairment substantially limits a major life activity, "courts consider the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact" of the impairment. *Ragusa v. Malverne Union Free Sch. Dist.*, 582 F. Supp. 2d 326, 341 (E.D.N.Y. 2008) (internal quotation marks omitted), *vacated in part on other grounds*, 381 F. Appp'x 85 (2d Cir. 2010); *see* 29 C.F.R. § 1630.2(j).

The factual allegations in the AC appear to describe – and conflate – three different disabilities:  (1) substance abuse, (AC ¶ 33); (2) orthopedic injuries, (AC ¶ 19-20, 39); and (3) bipolar disorder, (AC ¶ 38).  None of these impairments, as described in the AC, plausibly qualifies as a disability under the ADA.

First, with respect to Plaintiff's disability based on substance abuse, (*see, e.g.,* AC ¶ 33, 36), "past drug *addiction*, not merely past use, is required to make out a claim under the ADA." *Buckley v. Consol. Edison Co. of N.Y., Inc.*, 127 F.3d 270, 274 (2d Cir. 1997) (emphasis in original), *vacated on other grounds*, 155 F.3d 150 (2d Cir. 1998).  Here, the scant facts in the AC do not allege that Plaintiff was ever addicted, and Plaintiff therefore fails to plausibly allege that his substance abuse is an ADA-covered disability.  The AC provides practically no details about Plaintiff's substance abuse, including when it started, the substance abused, the frequency or duration of the abuse, the physical symptoms (if any) resulting from refraining, or the treatment required.  Moreover, Plaintiff fails to identify any major life activity his substance abuse impaired. *See Skinner v. City of Amsterdam*, 824 F. Supp. 2d 317, 330-31 (N.D.N.Y. 2010) (drug addiction covered under ADA only when it substantially limits major life activity).  Plaintiff has thus not plausibly alleged that his substance abuse was a disability within the meaning of the ADA.

Second, Plaintiff claims his October 2012 orthopedic injuries – a "shattered knee" and a "torn rotator cuff," (AC ¶ 19; *see id.* ¶ 39) – left him "temporarily unable to perform all of his duties,"[6] (*id.* ¶ 19).  The AC describes the following sequence of events:  Plaintiff sustained the orthopedic injuries in October 2012, and subsequently requested disability leave, which the Hospital granted "with a maximum twenty six week period [of leave] allowable . . . within a fifty two week period."  (*Id.* ¶ 20.)  Plaintiff then attempted to return to work on March 29, 2013 and, as described above, was subsequently fired.  (*Id.* ¶¶ 23-27, 30.)  Despite Plaintiff's references to his orthopedic injuries in the AC, he does not allege that the injuries impaired any sort of life activity at the time he attempted to resume his duties at the Hospital.  Significantly, neither Plaintiff's SDHR nor EEOC complaints, (Carling Aff. Ex. 1), nor those agencies' dismissals of Plaintiff's charges, make any mention of orthopedic injuries, (*id.* Exs. 3, 4).  SDHR's Determination After Investigation, adopted by the EEOC, specifically states that "[t]he record does not contain sufficient evidence to believe [the Hospital] engaged in an unlawful discriminatory practice against [Plaintiff] . . . due to his disability (Bipolar and Alcohol Abuse)."  (*Id.* Ex. 3.)

As Plaintiff apparently did not complain of orthopedic injuries at the time he protested his termination – approximately six months after the injuries occurred – it is not plausible that any limitations on major life activities (if they ever existed) were burdening Plaintiff at the time he was terminated.[7]  This is fatal to Plaintiff's claim that those injuries were covered under the

---

[6] Plaintiff appears to abandon the argument that these injuries qualify as disabilities under the ADA.  In his opposition papers, Plaintiff argues that his "claim is based upon his diagnosed mental disability," (P's Opp., at 3), and that only his mental disability impaired a major life activity, (*id.*, at 6-9).  But he does make at least one passing reference to a physical disability in his opposition, so, for the sake of argument, I will address whether the orthopedic injuries qualify as disabilities under the ADA.

[7] Moreover, Plaintiff's AC omits the rather illuminating fact that Plaintiff apparently was not actually absent from work continuously from the date of his orthopedic injuries in October 2012 until March 29, 2013.  Plaintiff's SDHR and EEOC complaint reveals that he had returned to work at least by February 18, 2013, without reference to any

ADA because "short-term, temporary restrictions are not 'substantially limiting' and do not render a person 'disabled.'" *Ragusa,* 582 F. Supp. 2d at 341 (quoting *Conley v. United Parcel Serv.*, 88 F. Supp. 2d 16, 19 (E.D.N.Y. 2000)); *see Colwell*, 158 F.3d at 646 (injury resulting in seven month impairment of major life activity too short to be "substantially limiting" under ADA) (internal quotation marks omitted); *Ragusa*, 582 F. Supp. 2d at 34 ("It is the limitation on the claimed major life activity that must be permanent or have a long term impact" to establish disability under the ADA.); *see also Hamilton v. Niagara Frontier Transp. Auth.*, No. 00-CV-300, 2007 WL 2241794, at *12 (W.D.N.Y. July 31, 2007) (collecting cases).

Finally, with respect to Plaintiff's "professionally diagnosed brain and bipolar disorder," Plaintiff asserts that he had been under the treatment of medical professionals for this condition for approximately the last fifteen years of his employment, (AC ¶ 38), during which time he performed his work in a "competent manner," (*id.* ¶ 18), received "exemplary and satisfactorily [*sic*] written evaluations," (*id.* ¶ 37), and "had never been previously disabled," (*id.*). While bipolar disorder can be an impairment under the ADA, *see Whalley v. Reliance Grp. Holdings, Inc.*, No. 97-CV-4018, 2001 WL 55726, at *4 (S.D.N.Y. Jan. 22, 2001), the AC fails to identify any major life activity that was limited by Plaintiff's specific case of bipolar disorder,[8] and

---

sort of accommodation, (Carling Aff. Ex. 1), leading to the reasonable inference that Plaintiff had recovered from his orthopedic injuries by early 2013.

[8] Plaintiff argues, for the first time in his opposition, that bipolar disorder can be a qualifying disability if it substantially impacts the major life activity of "thinking, concentration and functioning." (P's Opp., at 7.) But he still fails to show that *his* bipolar disorder limited a major life activity. First, a party may not use an opposition to a motion as a means to amend the complaint. *Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012). Second, Plaintiff still fails to allege facts showing that he, personally, was affected by bipolar disorder in a way that substantially limited a major life activity. Indeed, the AC is almost wholly devoid of facts explaining how bipolar disorder affected Plaintiff's life. Plaintiff claims he first suffered from some sort of disability covered by the ADA beginning on October 20, 2012, (AC ¶ 19), and, on October 28, 2012, Plaintiff ceased taking the medication prescribed to treat his bipolar disorder due to test results showing abnormal liver function, thereafter suffering a manic episode, (*id.* ¶¶ 38-39). Plaintiff provides no further information regarding whether he ever resumed taking medication for bipolar disorder, the extent or severity of the disorder after that date, or whether the disorder required any further treatment.

therefore fails to allege that his bipolar disorder is a disability covered by the ADA. *See Williams.*, 534 U.S. at 196 (mere diagnosis of an impairment, without showing that the impairment substantially limits life activity, is insufficient to trigger ADA protection).

Further, nothing about the events of March 29, 2013 indicate that Plaintiff's bipolar disorder inhibited him from performing his job at the time of his termination, or any other time. The only specific references made to an infirmity that day – Plaintiff's remarks that he was in a twelve-step program and had outpatient treatment three times per week, and the Hussain Letter's reference to "sobriety" – appear to relate to substance abuse. The only documentation from a medical professional that Plaintiff provided the Hospital on March 29, 2013 was the Hussain Letter regarding sobriety. (AC ¶¶ 26-27; Carling Aff. Ex. 6.) A different doctor was apparently treating Plaintiff's bipolar disorder. (*See* AC ¶ 38.) If bipolar disorder were the reason Plaintiff had been out of work, one would think he would have provided a fit-for-work letter from a relevant medical professional. It thus does not appear plausible that Plaintiff's bipolar disorder limited a major life activity at the time of the alleged discrimination.

Because the only conditions identified by Plaintiff are not plausibly qualifying disabilities under the ADA, on the facts presented, Plaintiff fails to state a cognizable ADA claim with respect to disparate treatment and failure to accommodate.

### B.  Failure to Exhaust Administrative Remedies

Even if Plaintiff had plausibly pleaded a qualifying disability, his claims for failure to accommodate, disparate treatment (apart from termination) and retaliation (apart from termination), would have to be dismissed for failure to exhaust.

Prior to filing an ADA claim in federal court, a plaintiff must exhaust administrative remedies with the EEOC or an authorized agency. *Spruill v. NYC Health & Hosp.*, No. 06-CV-

11362, 2007 WL 2456960, at *2 (S.D.N.Y. Aug. 23, 2007), *aff'd*, 367 F. App'x 269 (2d Cir. 2010); *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 314 (S.D.N.Y. 2003).  A court has jurisdiction to hear only claims that are contained in an EEOC charge or are "reasonably related" to the claims in the EEOC charge.  *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998).  The purpose of this requirement is to provide the EEOC "the opportunity to investigate, mediate, and take remedial action."  *Stewart v. I.N.S.*, 762 F.2d 193, 198 (2d Cir. 1985).

Defendant argues that Plaintiff failed to exhaust administrative remedies with respect to the "claims for retaliation, a failure to provide reasonable accommodation, and disparate treatment."  (D's Br. at 10-11.)  Those claims consist of allegations that Plaintiff was:  denied housing, break time and working-hours accommodations; demoted; and otherwise treated disparately compared to a coworker.  In contrast to the AC, the complaint Plaintiff submitted to the SDHR and EEOC contains allegations of discrimination based solely on Defendant's decision to terminate his employment.  Specifically, the complaint details the sequence of events on March 29, 2013 in which Plaintiff:  gave Sposato and Sanchez the Hussain Letter; told Sposato he was "ready, willing and able to start work [on March 29, 2013];" and told both Sposato and Sanchez that he has "out-patient treatment in place 3 nights a week, after the hours of my work day here . . . I am continuing to work[] through this issue . . . [and] I am actively in a 12 step program."  (Carling Aff. Ex. 1.)  Thus Plaintiff's claims of retaliation, disparate treatment, and failure to accommodate may proceed only if they are reasonably related to the complaint filed with the SDHR and EEOC.

"[A] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made."  *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (internal

quotation marks omitted).  The Court's focus in that regard is on the factual content of the administrative complaint, and whether the conduct complained of gave the agency "adequate notice to investigate discrimination on [multiple] bases."  *Id.* (internal quotation marks omitted). The reasonably related doctrine does not, however, "'permit a plaintiff to bring suit based on alleged prior acts . . . that could have been, but were not, asserted in the EEOC charge that was filed.'"  *Sussle*, 269 F. Supp. 2d at 315 (quoting *Hall v. City of N.Y.*, No. 00-CV-8967, 2002 WL 472057, at *4 (S.D.N.Y. Mar. 27, 2002)).

Plaintiff does not argue that the discrimination allegations in the AC, not discussed in the administrative complaint, are reasonably related to the administrative complaint.  Indeed, Plaintiff nowhere addresses Defendant's arguments regarding failure to exhaust.[9]  In any event, Plaintiff's administrative complaint could not have given the SDHR or EEOC adequate notice to investigate the AC's allegations of failure to accommodate, or retaliation or disparate treatment apart from termination.  The factual allegations in the SDHR complaint make no mention of any request for accommodation, or any disparate treatment or adverse employment action other than Plaintiff's termination.  (Carling Aff. Ex. 1.)  The SDHR's order of dismissal, adopted by the EEOC, indicates it investigated only whether Plaintiff "provide[d] the required 'fit for duty letter'" pursuant to the Hospital's "reasonable policy that it would not guarantee the job of any employee who was absent due to long-term disability for more than 26 weeks within 52 weeks [*sic*] period."  (*Id.* Ex. 3.)

---

[9] Because Plaintiff failed to address Defendant's exhaustion defense in his opposition, I could regard Plaintiff's silence as a concession with respect to that argument.  *See, e.g.*, *Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendant['s] arguments for dismissing such a claim;" collecting cases).  In an abundance of caution, however, I address the merits of Defendant's exhaustion argument.

There is literally nothing in Plaintiff's administrative complaint that could conceivably have reasonably given rise to an investigation of Plaintiff's requests regarding housing or any other accommodation.[10]  Similarly, there are no allegations in the administrative complaint that would have caused the agencies to investigate retaliation.  Plaintiff described neither ADA-protected activity nor retaliatory action.[11]  Nor did he check the retaliation box.  (Carling Aff. Ex. 1, at 5.)  "Courts in this district have often found that, where a plaintiff does not explicitly allege retaliation in an administrative complaint, the subsequent investigation of other forms of discrimination cannot reasonably be expected to extend to retaliation."  *Burke v. Gutierrez*, No. 04-CV-7593, 2006 WL 89936, at *12 (S.D.N.Y. Jan. 12, 2006) (collecting cases), *aff'd sub nom. Burke v. Evans*, 248 F. App'x 206 (2d Cir. 2007); *see, e.g., Dellaporte v. City Univ. of N.Y.*, 998 F. Supp. 2d 214, 232 (S.D.N.Y. 2014) (retaliation claim not reasonably related when protected activity and retaliatory motive not mentioned); *see also Morris v. David Lerner Assocs.*, 680 F. Supp. 2d 430, 437-38 (E.D.N.Y. 2010) (retaliation claim not reasonably related to EEOC charge simply because charge refers to termination).  The administrative complaint, even when referring to Plaintiff's termination, fails to allege that Plaintiff engaged in any sort of protected activity for

---

[10] Plaintiff's failure to accommodate claims relating to issues other than housing, even if they were fully exhausted and even if Plaintiff had a qualifying disability under the ADA, are (and were at the time of the administrative claim) moot.  Plaintiff requested that his break time be adjusted and that his working hours be temporarily changed so that he could attend medical and counseling appointments.  (AC ¶¶ 41-42.)  Regardless of whether these requests would have been accommodated, or whether refusing them would have been reasonable, they would come in to play only if Plaintiff returned to work, which he never did.  The only time Plaintiff alleges he actually informed anyone at the Hospital that he planned to return to work was Friday, March 29, 2013.  It is unreasonable to think that all of Plaintiff's requests would have, or could have, been met at that very moment.  The following business day, Monday, April 1, 2013, was the date he was to be terminated if he failed to provide medical clearance.  Thus, there was never an opportunity for the Hospital to grant Plaintiff's requests for accommodations.

[11] Plaintiff states in his opposition that his termination was "[t]he ultimate form of retaliation."  (P's Opp., at 10; *see* AC ¶ 55.)  But by Plaintiff's account, the refusal to let him return to work was discrimination itself, not retaliation for the essentially simultaneous request to return to work.  Were such a circular claim sufficient to put the administrative agency on notice of a retaliation claim, almost every discrimination allegation would also constitute a retaliation allegation.

which retaliation would be prohibited under the ADA, or that Plaintiff was fired – or was

otherwise retaliated against – because he engaged in protected activity.  The SDHR and EEOC,

therefore, could not possibly have been on notice of alleged retaliatory activity.  Here the

"reasonably related" doctrine cannot "be stretched to bridge the gap between the allegations

asserted in the plaintiff's [administrative] complaint and the claims he raises in this civil action."

*Mathirampuzha v. Potter*, 548 F.3d 70, 76 (2d Cir. 2008).[12]

---

[12] Even if Plaintiff had fully exhausted his retaliation claims, the AC would still fail to state a cognizable retaliation claim under the ADA.  "To make out a *prima facie* claim of retaliation, [Plaintiff] must show that (1) []he engaged in ADA-protected activity (2) of which defendants were aware, (3) []he was subjected to an adverse employment action, and (4) a causal connection existed between the adverse employment action and h[is] protected activity." *Ragusa*, 381 F. App'x at 89 (footnote omitted).  Plaintiff alleges he engaged in, and was retaliated against for, the following protected activity (which he engaged in "immediately after his October 20th 2012 disability and thereafter," (AC ¶ 36)): filing a union grievance; filing the September 30, 2012 EEOC and SDHR complaints, and challenging the amount of cumulative time charged while he was on disability leave, (*id.*).  None of these actions suffices.  Filing a union grievance (whether based on his losing a union appointment such as shop steward or being demoted to a less desirable position) is not protected ADA activity, nor is challenging one's employer's calculation of one's leave – unless one cites disability discrimination, which Plaintiff does not allege he did.  *See e.g., Clark v. Jewish Childcare Ass'n, Inc.*, No. 12-CV-9372, 2015 WL 1452134, at \*18 (S.D.N.Y. Mar. 31, 2015) (complaints are not ADA-protected activity unless they allege conduct unlawful under the ADA).  Further, the administrative complaint post-dated Plaintiff's discharge, as did the union grievance (and no information about the timing of the dispute over leave calculation is provided).  Plaintiff's termination obviously cannot have been retaliation for activity that occurred after that termination.

Plaintiff also says he was retaliated against by "being demoted" from "shop Stewart [*sic*]" and "being assigned to the maintenance shop," (AC ¶ 46), by his boss, Ozzie Dahl, (*id.* ¶ 43).  Plaintiff fails to provide the date on which he was demoted, but claims it occurred "prior to . . . March 29, 2013."  (*Id.* ¶ 46.)  It is impossible to discern when Plaintiff was demoted.  For all one can tell, it could have occurred years before.  Moreover, for the sake of argument, even if Plaintiff was demoted on February 18, 2013 – a date he concedes in his administrative complaint he was at work – and even if Plaintiff was engaged in some type of ADA-protected activity, he still fails to allege any facts showing that Dahl was aware that he was engaging in ADA-protected activity.  Plaintiff also claims that Dahl referred to him as an "overpaid asshole" after learning that Plaintiff "complain[ed] to [a] union representative."  (*Id.* ¶ 46.)  But, in light of the AC's failure to specify the date that Dahl's remark was made or an instance in which Plaintiff complained to his union other than the date on which he filed his grievance, the only reasonable conclusion is that Dahl was referring to Plaintiff's grievance filing, which occurred after Plaintiff's termination.  In any event, Plaintiff does not allege that either his union grievance or Dahl's remark made any reference to a disability, and the utter lack of context in the AC does not otherwise spark an inference of discrimination.  Finally, a lone harsh remark hardly amounts to retaliation.  *Cf. Wrobel v. Cnty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (*de minimis* slights and insults do not amount to retaliation).  Thus, Plaintiff's claims with respect to Dahl would not be enough to state a plausible ADA retaliation claim.

For the sake of thoroughness, I address Plaintiff's claim that his "threat of subsequent filing of charges with the EEOC and [SDHR and/or his union], was a motivating factor and made a difference in the decision to discharge plaintiff."  (*Id.* ¶ 56.)  Aside from the wholly conclusory nature of this allegation, Plaintiff nowhere makes a plausible or specific claim that he made any of these threats before the Hospital informed him that he would be terminated.  Plaintiff therefore cannot show that the Hospital was aware of any alleged protected activity, or any other indicia of causality, between the allegedly protected activity and adverse employment action.  In the end,

Finally, Plaintiff's administrative complaint contains nothing to put the agencies on notice of his disparate treatment claims arising from Plaintiff's supervisor having "made special arrangements" for Plaintiff's coworker after that individual's second driving while intoxicated offense.  (AC ¶¶ 43-45.)[13]  In short, nothing in Plaintiff's two-paragraph administrative complaint detailing his March 29, 2013 meeting would have put the EEOC on notice that a supervisor, at an unspecified date, gave another employee a special accommodation.[14]

Accordingly, Plaintiff's claims for failure to accommodate, retaliation (including his claim that his termination amounted to retaliation under the ADA) and disparate treatment (short of termination) – all claims he could have raised in his administrative complaint – are not

---

absent any non-conclusory assertions that protected activity occurred before the adverse employment action, all of Plaintiff's retaliation allegations fail to meet the basic plausibility standard of *Iqbal*, 556 U.S. at 678.  He simply fails to set forth facts suggesting his termination was a result of anything other than application of the Hospital's standard policy.  Accordingly, even if Plaintiff exhausted his remedies with respect to his retaliation claims, they would be dismissed because Plaintiff fails to allege the essential facts necessary to plausibly assert an ADA retaliation claim.

[13] The AC also nakedly asserts that Plaintiff was "subjected to harassment by . . . Sanchez and Sposato, and was treated disparately."  (AC ¶ 33.)  As Plaintiff fails to provide any further details regarding harassment, the Court disregards these entirely conclusory assertions.

[14] Even if Plaintiff exhausted his administrative remedies with respect to this disparate treatment claim, and even if Plaintiff had a qualifying disability under the ADA, Plaintiff's AC fails to allege facts that could plausibly lead to an inference of disparate treatment.  Disparate treatment under the ADA "is the most easily understood type of discrimination.  The employer simply treats some people less favorably than others because of their [protected characteristic]."  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (internal quotation marks omitted).  To succeed on such a claim, plaintiff must show that "the protected trait . . . actually motivated the employer's decision."  *Id.* (internal quotation marks omitted).  Plaintiff's detail-deficient AC does not come close to alleging facts that could plausibly lead to an inference that Plaintiff was terminated for anything other than failing to comply with Hospital leave policies.  Further, although Plaintiff's AC states (oddly, in the first-person) that the special arrangements made by Dahl for Heienmann were the same arrangements "I sought for my disability," (AC ¶ 44), Plaintiff fails to describe what arrangements those were, when they were made, or whether Dahl was even aware of Plaintiff's disability.  Plaintiff also claims that Sanchez "made exceptions for Mr. Heienmann on a variety of personnel matters, including lateness, absences and performance."  (*Id.* ¶ 45.)  But Plaintiff, again, fails to specify what those exceptions were, when they were made or the circumstances under which they were made.  Most fundamentally, Plaintiff does not allege that Heienmann missed 26 of 52 weeks and was allowed to stay, or any other facts from which one could infer that Plaintiff and his co-worker Heienmann were similarly enough situated that the employer's treatment of Heienmann could raise an inference that Plaintiff was mistreated based on disability.  Further, the facts Plaintiff alleges (as opposed to the conclusions) suggest it was Heienmann's friendship with the bosses, rather than any hostility toward Plaintiff, that motivated Heienmann's treatment.  Accordingly, Plaintiff's disparate treatment claims, if allowed to proceed, would be dismissed for failure to state a claim.

reasonably related to that complaint and are dismissed for failure to exhaust available administrative remedies.

### C. Discriminatory Termination

Defendant concedes that Plaintiff exhausted the only claim in his administrative complaint:  that the Hospital discriminated against him by not permitting him to return to work. I address it in an excess of caution, even though Plaintiff has not plausibly pleaded that he suffered from a qualifying disability.

Plaintiff does not quarrel with the Hospital's policy of holding an employee's job only until he or she misses 26 weeks in any 52-week period (which, after all, is more generous than federal law requires).  Nor does he suggest that it is discriminatory or otherwise unreasonable for the Hospital to require that the returning employee provide a doctor's note regarding his or her fitness for duty.  Rather, his complaint is that the Hospital discriminated against him by failing to reinstate him despite his presentation of a fitness-for-duty note.

The utter implausibility of this claim is revealed by simple reference to that note – *i.e.*, the Hussain Letter.  (Carling Aff. Ex. 6.)  It says nothing more than that Plaintiff participated in some sort of program, had no "major" behavioral issues, developed "some" insight, and would likely "maintain improvement" if he were to continue with outpatient treatment and maintain sobriety.  (*Id.*)  It says nothing at all about Plaintiff's fitness to return to work.  Indeed, it is not even addressed to his employer, nor does it otherwise indicate that the author is aware of Plaintiff's employment or what that employment entails.  Nor does it address Plaintiff's issues other than substance abuse.  And it is entirely conditional.  An employer reading this note would have no way of knowing if the employee had shown behavioral issues that might interfere with his work even if they were not considered "major" in the context of the program, or whether the

insight the employee had developed was complete enough for him to return to work without incident, or whether the improvement the employee had shown needed to be augmented before he was able to work, or whether the continued treatment he required would leave time for him to work, or how likely it was that he would maintain his sobriety and follow up with treatment. It is simply not plausible that regarding this note as insufficient to show fitness for duty was discrimination against a disabled employee rather than simply a reasonable interpretation of the doctor's words. Accordingly, even if Plaintiff were assumed to have a qualifying disability, the AC fails to state a plausible claim.

## IV.  Leave to Amend

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

In a letter dated June 25, 2014, Defendant identified several deficiencies in Plaintiff's original complaint. (Doc. 5.) Among other things, Defendant highlighted that: (1) the Hussain Letter was not sufficient to clear Plaintiff for work, (*id.* at 1-2); (2) the retaliation claims with respect to the Hospital's enforcement of its leave policy were conclusory, (*id.* at 2); and (3) the "prolix" complaint generally confused, rather than illuminated, the bases for Plaintiff's claims, (*id.*). At the July 31, 2014 pre-motion conference, the parties and the Court further discussed the

21

deficiencies in the original complaint, concentrating on its unspecific and generally confusing allegations regarding, among other things:  (1) the disabilities Plaintiff claims to have had; (2) the accommodations requested by Plaintiff; (3) the disparate treatment alleged; and (4) the protected activity that occurred before the adverse employment action.  The Court also emphasized its concern with the AC's untenable lack of factual allegations.  Plaintiff's failure to fix deficiencies in his previous pleadings, after being provided with full notice of the deficiencies, is alone sufficient ground to deny leave to amend *sua sponte*.  *See In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted); *see also Ruotolo*, 514 F.3d at 191 (affirming denial of leave to amend "given the previous opportunities to amend").  Further, Plaintiff in his opposition has not requested leave to file a second amended complaint or suggested that he is in possession of facts that would cure the deficiencies identified in this opinion.  A plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint.  *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).  Accordingly, I decline to grant Plaintiff leave to amend *sua sponte*.

**V.  Conclusion**

For the reasons set forth above Defendant's motion to dismiss is GRANTED.  The Clerk

of Court is respectfully directed to terminate the pending motion, (Doc. 9), and close the case.

**SO ORDERED.**

DATED:        White Plains, New York
              September 25, 2015

_____
                                        Cathy Seibel, U.S.D.J.